**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

ANTHONY PRICE, et al.,

                Plaintiffs,

                v.

THE COUNTY OF SALEM, et al.,

                Defendants.

Civil Action No. 22-6042 (MAS) (JTQ)

**OPINION**

**SHIPP, District Judge**

This matter comes before the Court on Defendants the County of Salem ("Salem County") and Warden John S. Cuzzupe's ("Cuzzupe" and, together with Salem County, "Defendants") motions for summary judgment. (ECF Nos. 172, 175, 178, 181.) Plaintiffs Sarah Provost ("Provost"), Christine Ottinger ("Ottinger"), Anthony Price ("Price"), and Robert Strauss ("Strauss") (collectively "Plaintiffs") filed an opposition to the motions (ECF No. 199), to which Defendants replied. (ECF No. 205.) Plaintiffs also filed a motion for summary judgment. (ECF No. 184.) Defendants filed opposition to that motion (ECF Nos. 197-98), to which Plaintiffs replied (ECF No. 204). Also before the Court is Defendants' motion to seal portions of the summary judgment record related to certain policies, treatment documents, and medical records. (ECF No. 191.) Plaintiffs opposed that motion. (ECF No. 193.) For the following reasons, Defendants' motions for summary judgment are granted in part and denied in part, Plaintiffs' motion for summary judgment is denied, and the motion to seal is granted.

## I.   BACKGROUND

This matter arises out of the "at-risk" placement and strip-search policies applicable to those placed in the at-risk unit of the Salem County jail. Each of the four Plaintiffs in this matter was admitted to the jail, classified as at risk during intake, and spent a few days in the at-risk unit before being released or transferred to the jail's general population. Under Salem County's suicide watch intake policy, once an inmate is identified as "at risk" of potential self-harm following completion of a questionnaire during intake, the inmate "must be thoroughly strip-searched in accordance with procedure for contraband" and then changed into a "Suicide Gown" until cleared for release from the at-risk unit. (*See* ECF No. 174-3 at 11, 13.) Inmates are not cleared for release from the unit until seen by a medical professional, which generally occurs between twenty-four and seventy-two hours after being placed in the at-risk unit. (ECF No. 173-15 at 169.) During this period, inmates in the at-risk unit are subjected to daily strip searches for drugs and contraband. (*Id.* at 106-07.) While these searches were conducted twice daily between 2015 and 2017, a policy change instituted by Defendant Cuzzupe in 2017 reduced the frequency to one strip search a day. (*Id.* at 106-07, 124.) Defendant Cuzzupe testified during his deposition that: (1) these policies were adopted in reaction to prior suicides in the jail; (2) the repeated searches are designed to discover contraband with which prisoners could harm themselves, chiefly drugs such as fentanyl; and (3) on occasions such items have been discovered in subsequent searches when not discovered in an initial intake search. (*Id.* at 106-07, 157-58, 163-64.)

Provost was admitted to the jail on charges of shoplifting and driving while on the revoked list on April 17, 2015. (ECF No. 173-2 at 2.) During an initial suicide-risk intake screening, a jail officer determined her to be at risk based on her being under the influence of drugs or alcohol, the risk of withdrawal symptoms, "disorient[ation] as to time and place," and being "unable to focus [her] attention." (ECF No. 173-3 at 2-4.) Provost was, therefore, placed in the at-risk unit for

2

observation pending further evaluation. (ECF No. 173-4 at 2.) She remained in the at-risk unit until she was cleared by mental health staff on April 20, 2015. (ECF No. 174-1 at 2.) Provost was strip-searched upon placement in the at-risk unit and subjected to five further strip searches before she was released from the unit. (ECF No. 173-4 at 2-7.) Provost asserts that on at least two occasions, a male officer was able to view her while a female officer conducted these strip searches. (ECF No. 199-12 at 5.)

Provost was ultimately released but returned to the jail on charges of violating probation and burglary on December 7, 2015. (ECF No. 173-6 at 2.) Provost was again determined to be at risk and placed in the at-risk unit.[1] (ECF No. 173-8.) She was strip-searched upon her placement and further searched two more times before being released on December 8, 2015. (*Id.* at 2-4.) Provost was thereafter intermittently strip-searched upon her return to the jail following court appearances. (*Id.* at 5-8.) Those searches were not part of the challenged policy in this matter. (*Id.*)

During her time in the at-risk unit, Provost was required to wear an "anti-suicide vest," which was designed to prevent self-harm and was held together using Velcro. (*See generally* ECF No. 199-10 at 3.) She asserts that because the vest fit her poorly and the Velcro straps did not hook properly, it often left her body exposed. (*Id.*)

Ottinger was admitted to the Salem County jail on July 22, 2015. (ECF No. 177-2 at 2.) During her intake screening, Ottinger was determined to be at risk of suicide due to treatment for mental health issues. (ECF No. 177-1 at 2.) She was prescribed depression medication, experienced a recent death in her family, previously attempted suicide in her youth, and

---

[1] This placement appears to have been based on a history of mental health and substance abuse issues noted by the New York facility that transferred her to New Jersey. (*See* ECF No. 174-2 at 2-3.)

3

experienced symptoms of depression. (*Id.* at 3.) Ottinger was strip-searched following her intake and was strip-searched a second time upon arrival in the at-risk unit. (ECF No. 184-19 at 3-4.) Ottinger contends that she was strip-searched nine times in the forty-eight hours she was in the at-risk unit before being released from the unit following clearance by mental health staff. (*Id.* at 3-6.) These occurrences included twice daily regular searches, additional searches conducted when leaving the unit for her mental health interviews and following shower usage. (*Id.*) Like Provost, Ottinger contends that the anti-suicide vest she was required to wear was ill fitting, with the Velcro failing to hold the outfit together to sufficiently cover her body. (ECF No. 177-5 at 9.) Ottinger also testified during her deposition that she believed she was strip-searched in view of male officers on two instances. (*Id.* at 10-11.)

Price was admitted to the Salem County jail after a transfer from Camden County on September 28, 2017, while facing municipal court charges. (ECF No. 184-20 at 2-3.) Price was strip-searched upon arrival at the jail. (ECF No. 180-4 at 6.) He was thereafter given an at-risk intake questionnaire and was determined by jail staff to be at risk based on a history of drug or alcohol use and anticipated withdrawal symptoms. (*See* ECF No. 179-3 at 2.) Price asserts that he was thereafter strip-searched again upon arrival to the at-risk unit, required to change into an anti-suicide gown that was ill-fitting, and placed in an at-risk cell. (ECF No. 184-20 at 5.) Price was strip-searched again the following afternoon. (ECF No. 179-5 at 2.) Later in the afternoon of September 29, 2017, Price was seen by mental health staff and cleared for eventual release into the general population. (ECF No. 184-20 at 6.) Price asserts he was thereafter searched when he returned to the at-risk unit, and once more that evening, before his release from the unit. (*Id.*)

Strauss was admitted to the Salem County jail on October 7, 2017, on charges relating to the possession and sale of hypodermic syringes. (ECF No. 199-4 at 2.) Strauss was found by jail staff to be at risk based on his history of drug use and concern for his medical condition, and he

4

was placed into the at-risk unit. (ECF No. 182-4 at 4.) Strauss was ultimately released from the at-risk unit on October 8, 2017, at 5:00 p.m. (ECF No. 199-4 at 3.) Strauss was again admitted to the jail for charges related to possession of needles on January 4, 2020. (ECF No. 183-1 at 2.) He was not initially determined to be at risk but was moved to the at-risk unit on January 6, 2020, following the onset of withdrawal symptoms. (*Id.* at 4-5.) While in the jail, Strauss was strip-searched twice. (ECF No. 183-1 at 11-12.) He was ultimately released on January 6, 2020, at 11:00 p.m. (ECF No. 199-4 at 5.)

## II.   **LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 56(a), a court should grant a motion for summary judgment where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is material "if it bears on an essential element of the plaintiff's claim," and is genuine if "a reasonable jury could find in favor of the non-moving party." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). In deciding a motion for summary judgment, a district court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," *id.*, but must not make credibility determinations or engage in any weighing of the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [however,] there is no genuine [dispute] for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

5

Once the moving party has met this initial burden, the burden shifts to the non-moving party who must provide evidence sufficient to establish that a reasonable jury could find in the non-moving party's favor to warrant the denial of a summary judgment motion. *Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 65 (3d Cir. 1996); *Serodio v. Rutgers*, 27 F. Supp. 3d 546, 550 (D.N.J. 2014).

> A nonmoving party has created a genuine [dispute] of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial. However, the party opposing the motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine [dispute] as to a material fact for trial.

*Serodio*, 27 F. Supp. 3d at 550.

## III.    DISCUSSION

### A.    Defendants' Time Bar Argument

Defendants first argue that Plaintiffs' claims, other than those explicitly arising out of the *Stevenson* class action, are time barred. Federal civil rights claims filed in New Jersey are subject to New Jersey's two-year statute of limitations for personal injury actions. *Fisher v. Hollingsworth*, 115 F.4th 197, 210 (3d Cir. 2024); *Patyrak v. Apgar*, 511 F. App'x 193, 195 (3d Cir. 2013). Civil rights claims likewise accrue when the plaintiff becomes aware of his injury. *See, e.g.*, *Wallace v. Kato*, 549 U.S. 384, 389-90 (2007); *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009). Accordingly, because Plaintiffs initially filed this matter on October 12, 2022, any claim that accrued prior to October 12, 2020, would be untimely absent some basis for tolling the applicable limitations period.

In this matter, the record indicates that Plaintiffs challenge being subjected to Salem County's policies for events that all occurred prior to October 2020. Plaintiff Provost's claims relate to her placement in the Salem County jail between April 2015 and June 2015, and between December 2015 and May 2016. Plaintiff Ottinger was present in the jail during July 2015 and

6

March 2020. Plaintiff Strauss was subjected to the challenged policies in October 2017 and January 2020. Plaintiff Price was placed in the jail in September 2017. Absent a basis for tolling the limitations period, then, all Plaintiffs' claims arise from conduct occurring more than two years before the filing of the complaint and would therefore appear to be time barred.

Plaintiffs have asserted throughout this matter that their claims are timely because they are opt-outs from the class action complaint in *Stevenson*, and the *Stevenson* action should serve to toll their limitations periods pursuant to *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and its progeny. Under *American Pipe*, members of a specified class in a class-action suit are treated as parties to that matter unless and until they cease to be members of the asserted class, whether by opting out of the class action, by the end of the class action case, or by the denial of class certification. *See, e.g., Aly v. Valeant Pharms. Int'l Inc.*, 1 F.4th 168, 172-78 (3d Cir. 2021). As such, the claims of all putative class members are tolled from the date on which the class action is filed until they cease to be members of the putative class. *Id.*

There is significant disagreement among the courts of appeals regarding how similar a claim must be to those raised in a class action to warrant the application of *American Pipe* tolling. *See, e.g., Crump v. Passaic County*, 147 F. Supp. 3d 249, 260 (D.N.J. 2015) (collecting cases). Some courts have required claims to be identical to warrant tolling, while other courts rest largely on notice principles to determine whether tolling is appropriate and therefore require a common factual and legal nexus between the current suit and prior class action. *Id.; In re Cmty. Bank of N. Va.*, 622 F.3d 275, 299-300 (3d Cir. 2010). The Third Circuit has not taken a side in this debate formally but has held, in at least one instance, that a claim which is "substantively identical" to the original class complaint should benefit from the rule. *Cmty. Bank*, 622 F.3d at 300 n.17; *see also Yang v. Odom*, 392 F.3d 97, 112 (3d Cir. 2004), *abrogated by China Agritech v. Resh*, 584 U.S. 732 (2018) (holding that *American Pipe* does not apply to subsequent class actions). This would

require, at the very least, that a claim share a common factual and legal nexus with those raised in the earlier class action. *See Crump*, 147 F. Supp. 3d at 260-61; *see also Williams-Hopkins v. Allied Interstate, LLC*, No. 20-226, 2020 WL 2731101, at *4 (D.N.J. May 26, 2020).

In *Stevenson*, the class raised the following claims: (1) a claim asserting that the jail's policies regarding strip-searching individuals with nonindictable offenses and those placed into the jail's suicide-watch unit violated the State Constitution and N.J. Stat. Ann. § 2A:161A-1 *et seq.*; (2) a municipal liability claim against the county based on that strip-search policy; (3) a claim asserting that routine and repeated strip searches of inmates assigned to the jail's close-custody unit violated state law because the policy in question had no penological purpose; (4) a claim asserting that the failure to provide individuals in the jail's suicide-watch unit with adequate clothing violated the state constitution because such clothing restrictions had no legitimate penological purpose; and (5) a claim asserting that permitting strip searches of female detainees in the presence of male officers violated the New Jersey Law Against Discrimination ("NJLAD"). (*See generally* ECF No. 199-7.)

On February 14, 2020, the state court entered its class certification order. (*See* ECF No. 199-10 at 1.) In that order, the state court certified the following classes and claims for the *Stevenson* class action: (1) claims on behalf of a class of those who were strip-searched based on an at-risk classification without further reasonable suspicion; (2) a class claim based on detainees in the at-risk unit being strip-searched repeatedly while remaining in the unit on lockdown; (3) a class claim on behalf of those who were strip-searched in a group setting; and (4) a class claim on behalf of those who were strip-searched in the at-risk unit while being videotaped and observed by unauthorized jail staff. (*Id.* at 3.) The State Court denied class certification for the claims asserting that female inmates had either been strip-searched under CCTV viewing or where male

8

staff could view them. (*Id.*) The record before the Court thus indicates that the NJLAD-related claims did not survive class certification in *Stevenson*.

In their operative complaint, Plaintiffs raise the following claims: (1) that the jail's policy of routine and repeated strip-searches while under surveillance violates the Fourth Amendment and the state constitution of New Jersey ("Count One"); (2) that the "arbitrary" classification of Plaintiffs as "at risk" of self-harm amounted to unconstitutional punishment in violation of the Fourteenth Amendment ("Count Two"); (3) that the at-risk classification system used by the jail violated state law because the policy was not sufficiently vetted by medical professionals ("Count Three"); (4) that the constant surveillance of Plaintiffs was improper under state law because they were improperly placed in the "at-risk" unit and thus subjected to heightened surveillance ("Count Four"); (5) that the strip searches incurred because of "at-risk" status violated state law ("Count Five"); (6) that the failure to provide adequate clothing to Plaintiffs during their time in the "at-risk" unit violated the Fourteenth Amendment and state law ("Count Six"); (7) that strip searches conducted under video surveillance violated state law ("Count Seven"); (8) that the jail violated the NJLAD[2] by permitting male staff to view directly or through surveillance the female plaintiffs in various states of undress ("Count Eight"); and (9) that Defendants improperly denied Plaintiff Provost medical care for drug dependence in violation of the Fourteenth Amendment and state law ("Count Nine").

---

[2] NJLAD claims are also subject to New Jersey's two-year statute of limitations and accrue "on the day that [a discrete discriminatory act] happens." *Brown v. R.R. Grp. Ltd. Liab. Co.*, No. 16-4602, 2017 WL 1365215, at *1 (D.N.J. Apr. 7, 2017) (citation omitted). Civil rights claims premised on state law violations are likewise subject to the same two-year personal injury statute of limitations that applies to federal civil rights claims in New Jersey. *See, e.g., Bullock v. Borough of Roselle*, No. 17-13208, 2018 WL 4179481, at *9 (D.N.J. Aug. 31, 2018). All of Plaintiffs' claims thus are subject to the same two-year limitations period, and this Court thus discusses all of the claims together.

As Defendants readily admit in their motions, Plaintiffs' claims set forth in Counts One, Three, and Seven are essentially identical or equivalent to the claims raised in *Stevenson*, and thus are subject to tolling under *American Pipe*, and therefore appear to be timely.[3] Defendants argue, however, that the remaining claims should be dismissed as time barred because Plaintiffs' claims had accrued by early 2020, and their limitations period had run by the filing of this case in late 2022. Defendants further argue that the remaining claims are not substantively identical and therefore should not benefit from *American Pipe* tolling in regard to the *Stevenson* class action.

Even assuming that a claim would be entitled to *American Pipe* tolling so long as it met the minimal requirements of having a legal and factual nexus with the class action, two claims— those raised in Counts Four and Nine—clearly do not meet this test because they assert different legal bases for relief separate and apart from those certified in *Stevenson* and thus fail to have a sufficient factual and legal nexus with the claims raised in *Stevenson* to warrant *American Pipe* tolling. Because each of these claims had accrued by January 2020, and this matter was not filed until more than two years later, in October 2022, and as Plaintiffs have failed to present an alternative basis for the tolling of the limitations period for these claims, Plaintiffs' claims in Counts Four and Nine are dismissed with prejudice as time barred.

In Count Eight, the female Plaintiffs assert claims based on the NJLAD related to the viewing of their strip-searches by male officers. Similar claims were raised in *Stevenson*, but the record before the Court indicates that the state court denied class certification as to those claims in

---

[3] As discussed above, *American Pipe* tolling applies during the pendency of a class action case unless and until the plaintiff ceases to be a part of that class through the denial of certification or opting out of the class. It is not clear from the record before the Court when any of the four Plaintiffs opted out of class status. It is entirely possible that these four Plaintiffs' claims may have further timeliness issues depending upon when they opted out and ceased to be covered by *American Pipe* tolling, but the record does not contain sufficient evidence to determine when any particular Plaintiff opted out of the relevant class.

February 2020. Any tolling those claims were entitled to receive under *American Pipe* thus expired when that order was entered, and Plaintiffs had at most two years from that date to file their claims. As Plaintiffs did not file their claims until much more than two years later—in October 2022 at the earliest—and Plaintiffs have provided no other clear basis for tolling, Plaintiffs' NJLAD claims raised in Count Eight of the operative complaint are also time barred.

The remainder of Plaintiffs' claims, while not necessarily identical to the claims raised in *Stevenson*, share a factual and legal nexus with the claims in *Stevenson*. They assert that the strip searches, inadequate clothing, and classification system the jail used to determine who would be subject to repeated strip searches were improper insomuch as they lacked a legitimate penological purpose. Although these claims raise some new issues—different code sections, or federal equivalents to the state law issues raised in *Stevenson*—the core factual issues are similar or the same as those raised in *Stevenson*, and the legal questions are directly connected to those at issue in *Stevenson*. The claims raised in Counts Two, Five, and Six are, thus, entitled to *American Pipe* tolling. Defendants' arguments to the contrary are without merit.

### B.    The Constitutionality of the Strip-Search Policy

Plaintiffs and Defendants both argue that they are entitled to summary judgment as to Plaintiffs' claims regarding the strip-search policies related to the jail's at-risk unit. In considering the constitutionality of a strip-search policy under the Fourth and Fourteenth Amendments, courts "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Parkell v. Danberg*, 833 F.3d 313, 324 n.6, 326 (3d Cir. 2016) (citation omitted). A jail strip-search policy will therefore be reasonable and pass muster if it strikes "a reasonable balance between inmate privacy and the needs of the institution." *Id.* (quoting *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 339 (2012)). As the Third Circuit has explained,

In balancing those interests in the [jail] context, we must give considerable weight to the place in which [the search] is conducted . . . and [give] considerable deference to [the jail's institutional security] justification for initiating it. [C]orrectional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities. A regulation impinging on an inmate's constitutional rights must be upheld if it is reasonably related to legitimate penological interests. . . . [T]he task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials. Unless there is substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations[,] courts should ordinarily defer to their expert judgment in such matters.

*Id.* (second and fourth alterations in original) (internal citations and quotations omitted).

In balancing these interests, the Supreme Court has upheld: (1) visual body cavity searches for prison inmates after in-person visits with family members in light of the legitimate interest in deterring the smuggling of contraband; and (2) initial intake searches of county jail inmates upon their arrival at the jail and before placement in a general population unit on similar grounds notwithstanding the significant intrusion that such a strip search entails. *Id.* at 326-27; *Florence*, 566 U.S. at 328-40.

A strip-search policy will become excessive and unreasonable even considering a facility's security interest in deterring the smuggling of contraband or dangerous items where the policy requires frequent and repeated searches without sufficient intervening opportunity to acquire contraband. *Parkell*, 833 F.3d at 328. Even in so holding, however, the Third Circuit clarified that: (1) the legitimate interest in deterring contraband smuggling was sufficient to support repeated strip searches *after* opportunities for acquiring such items had occurred; and (2) such searches may be warranted in instances where a prisoner leaves and returns to a secured unit even if he did not actually leave the jail facility entirely. *Id.* "Routine, suspicionless inmate search policies may sweep broadly and still be reasonable," but such policies may not sweep *too broadly*

12

without a sufficient penological basis. *Id.* at 329.  Moreover, "a blanket policy of frequently and intrusively searching inmates who have previously been thoroughly searched and held in a stripped-down isolation cell without human contact ever since" will frequently be unreasonable in light of the relevant concerns. *Id.*

In this matter, the parties are not concerned with the jail's initial intake strip-search policy, although the fact that Plaintiffs were strip-searched upon entry into the jail is relevant to their claims.  Rather, the parties dispute the policy that required repeated strip searches of inmates placed in the jail's at-risk unit.  Defendants contend that, in light of the security and safety interests applicable to a suicide watch unit, their policy is sufficiently reasonable to pass constitutional muster such that they are entitled to summary judgment on Plaintiffs' strip-search claims.  Viewing the facts in the light most favorable to Plaintiffs, however, the Court cannot grant Defendants summary judgment on this claim.  Defendants' policy required at least daily and, prior to 2017 twice daily, intrusive strip searches for inmates in an at-risk unit under regular supervision with, at best, exceedingly limited opportunities to acquire contraband or self-harm objects.  Defendants may have a point that this policy was designed to limit the ability of those in the at-risk unit to hurt themselves while awaiting a mental health evaluation.  Such concerns provide a rational basis that could potentially support strip searches upon admission to the unit and when returning to the unit following time away from the unit for medical or other purposes.  A rational factfinder, nevertheless, could find, when viewing the facts in the light most favorable to Plaintiffs, that Defendants' policy was excessive.  Defendants' policy included daily or twice daily strip searches for inmates who had remained in the unit throughout the day without access to clothing, beyond the provided vest, and who had limited contact with people other than those in the unit. *See Parkell*, 833 F.3d at 328-29.  Defendants are therefore not entitled to summary judgment on this claim.

Plaintiffs likewise contend that they are entitled to summary judgment as to the strip-search claims, asserting that the policy in place was clearly excessive in relation to its purposes in light of *Parkell* and similar cases. Plaintiffs, however, do not recognize the significant differences between *Parkell* and the current matter. The fact that the searches were imposed not simply to deter contraband but to also prevent what Defendants viewed as a risk of self harm provides support for the search policies at issue in this matter that was not present in *Parkell*.[4] This matter is also distinguishable from *Parkell* in light of the limited time frame during which an individual would normally be subject to the policy at issue here – a matter of only a few days pending mental health review rather than the potentially long-term housing assignment at issue in *Parkell*. Some Plaintiffs also appear to have had other inmates in their area or cell during the relevant observation period, a marked difference from the complete lack of human contact at issue in *Parkell*. *First*, considering that "routine, suspicionless inmate search policies may sweep quite broadly and still be reasonable," *Parkell*, 833 F.3d at 328; *second*, that this matter involves not only the general security interest in deterring contraband but also the jail's legitimate interest in preventing suicide by inmates perceived to be at risk upon admission; *third*, the limited time frame involved in at-risk unit placements in this matter; and *fourth*, viewing all disputed facts (such as the level of

---

[4] Plaintiffs spend a significant portion of their moving brief contending that the jail cannot have a rational interest in deterring suicide because they believe that the questionnaire used to initially determine at-risk status is arbitrary or not sufficiently vetted by medical personnel. Plaintiffs, however, have provided no caselaw to support their implied assertion that the jail cannot have any rational interest in deterring or preventing suicide absent a policy vetted to Plaintiffs' satisfaction. Caselaw suggests that jails should be proactive in seeking to prevent suicides. *See, e.g., Palakovic v. Wetzel*, 854 F.3d 209, 223-24 (3d Cir. 2017) (finding that jail or prison staff could be held liable for a suicide where they failed to adequately care for an inmate with a particular vulnerability to self-harm). The Court, therefore, cannot discount the jail's interest in preventing suicide merely because the vehicle used to express that interest—the intake questionnaire process—was arguably less than ideal.

surveillance, and ability of staff other than supervisors to view that surveillance)[5] in the light most favorable to Defendants, Plaintiffs have failed to establish their entitlement to summary judgment at this time as to the Fourth Amendment strip-search claim.

Plaintiffs also move for summary judgment on their statutory claim that the strip-search policy in Salem County violates N.J. Stat. Ann. § 2A:161A-1(c) and its applicable regulations, giving rise to liability under the New Jersey Civil Rights Act. Under the statute, a strip search of a detainee at a county jail who is "detained for commission of an offense other than a crime" may not be conducted absent "a reasonable suspicion that a weapon, controlled substance, . . . or contraband . . . will be found, and the search is authorized pursuant to [the applicable] regulations." *Id.* The applicable regulations for those jailed for "the commission of a crime" permits strip searches "before placement of an inmate under a psychological or suicide watch" unit. N.J. Admin. Code § 10A:31-8.5(b)(3). The regulations applicable to those arrested for committing offenses "other than a crime," however, do not contain this explicit authorization, although they permit strip searches in "emergent conditions" where officers seek to prevent bodily harm. N.J. Admin. Code § 10A:31-8.4(a)(4). The language in the statute and regulations referring to offenses "other than a crime" has been interpreted by the Appellate Division of the Superior Court of New Jersey to refer to non-indictable offenses. *See State v. Brown*, 456 N.J. Super. 352, 360 (N.J. Super. Ct. App. Div. 2018).

---

[5] There is significant dispute in the record over whether the strip searches of the female Plaintiffs were conducted under camera supervision in a cell or in a shower in the at-risk unit, as well as whether any video recording of a strip search was viewable by anyone other than a small subset of supervisors under limited circumstances. Viewing the facts in the light most favorable to Defendants for the purposes of Plaintiffs' motion for summary judgment, a rational trier of fact could find that: (1) the female Plaintiffs may not have been surveilled during their strip-searches; (2) recorded video, if any, was not viewable by unspecified officers and the scope of those able to view the video after the fact was quite limited; and (3) the video surveillance is, therefore, not a significant aggravating factor that would render Salem County's policies unreasonable or excessive. (*See, e.g.*, ECF No. 173-15 at 161-64.)

Defendants' position, as provided in the warden's deposition testimony, is that: (1) the determination that a person was at risk amounts to a reasonable suspicion sufficient to warrant the strip searches conducted under the state statute; and (2) they should not, in any event, be liable if they were never told by the State that their policies violated the applicable regulations. The lack of notice from the State is not relevant to whether Defendants technically violated the statute. Further, it appears that Defendants may have technically violated that statute because at least some of the searches at issue occurred during jail stays for apparent non-indictable offenses and without reasonable suspicion of the presence of drugs, weapons, or contraband. Here, Defendants' position is relevant to a question that the parties have not addressed in detail—the required mental state.

Although Plaintiffs present their claim in their moving brief as a clear statutory violation of § 2A:161A-1(c), they raised the claim in this matter through the New Jersey Civil Rights Act ("NJCRA"). (*See* ECF No. 42 at 18.) The NJCRA is the state analogue to § 1983, and claims under the Act are generally subject to the same elements, defenses, and considerations as an equivalent federal civil rights claims. *See, e.g., Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011). Civil rights actions under § 1983 do not generally permit for strict liability but, rather, a defendant must normally act with a sufficiently culpable mental state. *See, e.g., Carson v. N.J. Dep't of Corr.*, No. 16-5163, 2019 WL 2137364, at *4 (D.N.J. May 16, 2019). In a civil rights suit related to jail conditions, this normally requires acting with at least deliberate indifference to the rights of the inmate. *See id.* In this matter, neither party has addressed the applicable mental state for Plaintiffs' NJCRA claim related to the state strip search statute directly,[6] nor has either party provided the Court with New Jersey caselaw clearly indicating that strict

---

[6] Plaintiffs assert without sufficient legal basis that these claims should be considered "per se" NJCRA violations. (*See* ECF No. 199 at 47.) Plaintiffs provide no case for this proposition, nor do they otherwise adequately support it.

16

liability applies. A reasonable fact finder could find that Defendants did not act with deliberate indifference to the rights of Plaintiffs in adopting their policies and instead find that Defendants were focused on preventing suicides. Plaintiffs, consequently, have not established their entitlement to summary judgment to the extent that the mental state of deliberate indifference would apply to this claim. Plaintiffs' motion for summary judgment, therefore, is denied without prejudice as to this claim. Plaintiffs are granted leave to file a second motion for summary judgment limited solely to this claim (liability in light of a violation of N.J. Stat. Ann. § 2A:161A-1(c)) within thirty days to the extent they believe they can establish that a mental state lesser than deliberate indifference should apply.

### C.    Defendants' entitlement to summary judgment as to their at-risk placement policy

Defendants also argue that they are entitled to summary judgment on Plaintiffs' claim that the jail's at-risk placement policy amounts to punishment without a conviction in violation of the Fourteenth Amendment. Under the Fourteenth Amendment, a pre-trial detainee may not be subjected to conditions that would amount to improper punishment without a supporting conviction. *Hubbard v. Taylor*, 538 F.3d 229, 231 (3d Cir. 2008); *Bell v. Wolfish*, 441 U.S. 420, 535 (1979). Absent evidence of an express intention to punish, a challenged jail condition will amount to unconstitutional punishment where the condition is not rationally related to a legitimate penological goal or is excessive in relation to the goal and therefore may be fairly said to be arbitrary or purposeless. *Bell*, 441 U.S. at 538-39.

The jail's challenged at-risk policy in this matter is related to a legitimate penological interest—protecting inmates believed to be at risk of suicide from self harm. If the policy merely used the jail's questionnaire to identify individuals believed to be at risk of hurting themselves and placed them under continual observation until cleared by mental health staff, that policy would

17

almost certainly pass constitutional muster. The jail's at-risk policy, however, does not just expose those who scored at a certain level on the questionnaire to observation but instead subjects them to the entire regime of at least daily strip searches. Preventing jail suicides is a legitimate and noble goal. Nevertheless, viewing the facts presented in the light most favorable to Plaintiffs, a reasonable fact finder who does not find the jail's staff credible could find that the policy and its strip-search regime is excessive in relation to that goal. A rational factfinder could likewise potentially find that Defendants were at least deliberately indifferent to the rights of Plaintiffs in light of the policy's heavy focus on repeated strip searches as the method for detecting the means of self harm. As such, Defendants are not entitled to summary judgment as to this claim.

Defendants also move for summary judgment as to Plaintiffs' equivalent state law claim asserting that the policy is unlawful under state law as it is excessive and was not sufficiently developed under the auspices of medical professionals. The relevant administrative code section, N.J. Admin. Code § 10A:31-13.24, states that county jails "shall ensure that a written suicide prevention and intervention plan shall be developed that is reviewed and approved by a qualified medical or mental health professional." The warden, in his testimony, stated that the jail's policy was developed alongside the jail's medical contractor and its medical staff. (ECF No. 173-15 at 165.) Plaintiffs, in turn, argue that in prior litigation, staff of the medical provider have testified that they have only provided feedback on policies rather than expressly approving or condoning the use of the policies. (*See* ECF No. 184-24 at 6-8.) The same testimony, however, indicates that medical staff helped "refine" and develop the at-risk questionnaires. Thus, there is some dispute over whether the medical contractor's involvement is enough to meet the requirements of the administrative code. The Court need not at this time resolve the parties' dispute over whether the policy was sufficiently vetted and approved by the medical contractor. Here, Plaintiffs' state law claim appears to raise a claim similar to the Fourteenth Amendment claim discussed above, with

18

the added wrinkle of the alleged violation of the administrative code. For the reasons discussed in relation to the Fourteenth Amendment claim, a rational factfinder could potentially find that the policy is both excessive in relation to its purpose and is not sufficiently approved by medical staff. Defendants, therefore, are not entitled to summary judgment as to this claim at this time.

**D.     Defendants' arguments as to Plaintiffs' clothing claims**

Defendants next argue that they are entitled to summary judgment as to Plaintiffs' claims that the anti-suicide vests they were provided amount to inadequate clothing in violation of the Fourteenth Amendment. Although the Court understands Plaintiffs' embarrassment at the exposure the anti-suicide vests may have resulted in, the requirement that inmates viewed as at risk of suicide wear only clothing that cannot be used for hanging or harming one's self is rationally related to the jail's legitimate interest in preventing suicides. Given the fact that Plaintiffs were only required to wear these clothes for a relatively short period—a matter of a few days at most—the policy regarding the garments in the at-risk unit is not so excessive in relation to the jail's purpose that it amounts to unlawful punishment. *See Bell*, 441 U.S. at 538-39. Thus, even viewing the facts in the light most favorable to Plaintiffs, Defendants are entitled to summary judgment as to Plaintiffs' claims that the anti-suicide vests amounted to insufficient clothing.

**E.     Defendants' arguments as to the policy of conducting strip searches under camera review**

Defendants also argue that they are entitled to summary judgment as to Plaintiffs' claim, in Count Seven of their Complaint, that conducting strip searches under video surveillance violated applicable state law. The relevant state statute, N.J. Stat. Ann. § 2A:161A-4, provides that strip searches "shall be performed by persons of the same sex . . . and at a location where the search cannot be observed by persons not physically conducting the search." Defendants argue that they should be granted summary judgment as to this claim because Plaintiffs have not provided direct

evidence to support the contention that any identifiable individual who was not authorized to view the material actually watched any strip search through video surveillance. Even assuming that Plaintiffs have failed to make a specific showing that anyone actually reviewed the surveillance of their strip searches, Plaintiffs have provided testimony regarding viewing, including cross-sex viewing, of their strip searches by officers not involved in the searches in question. This appears to be sufficient to show a potential violation of the statute. Those facts, coupled with the presence of cameras, would permit a rational factfinder to potentially find that unauthorized viewing did occur when viewing the facts in the light most favorable to Plaintiffs. Defendants, therefore, are not entitled to summary judgment on this claim at this time.

### F.    Defendants' qualified immunity arguments

Defendants argue that they are entitled to qualified immunity as to Plaintiffs' federal claims related to the at-risk placement and strip-search policies discussed above. Initially, the Court notes that municipal Defendants like Salem County are not eligible for qualified immunity. *See, e.g., Crosland v. City of Phila.*, 676 F. Supp. 3d 364, 381 (E.D. Pa. 2023); *see also Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017). Thus, to the extent the County sought qualified immunity, it must be denied. Defendant Cuzzupe, however, as an individual, may be entitled to qualified immunity in this matter.

"The doctrine of qualified immunity shields government officials who perform discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, (2011)). In determining

20

whether immunity applies, courts apply a two-pronged test: "a court must decide 'whether the facts that a plaintiff has . . . shown make out a violation of a constitutional right'[, a]nd second, the Court must determine 'whether the right at issue was clearly established at the time of [the] defendants' alleged misconduct.'" *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). For a claim to be clearly established, "existing precedent [must have] placed the . . . constitutional [right in] question *beyond debate.*" *Id.* at 638. With the exception of cases involving "obvious violations" of prior Supreme Court rulings, a plaintiff's claim will only be "clearly established" where "the violative nature of the *particular* conduct [was] clearly established." *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020). The conduct in question must therefore be defined at an "appropriate level of specificity," *Spady*, 800 F.3d at 638, and, when so defined, the plaintiff must identify "a case where an officer acting under similar circumstances . . . was held to have violated" the constitutional provision in question. *James*, 957 F.3d at 169-70. For the purposes of this analysis, "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a robust consensus of cases of persuasive authority in the Courts of Appeals" in effect at the time of the conduct in question. *Id.* at 170.

As discussed above, Plaintiffs have provided colorable claims for relief under the Fourth and Fourteenth Amendments in relation to the at-risk policy and associated strip searches. The right chiefly at issue in both claims is the right of detainees in a county jail to be free from repeated strip searches based on a suicide prevention intake protocol prior to being reviewed by mental health personnel, where there is limited intervening opportunity to acquire contraband or other dangerous items. The case most on point and informative of those rights is *Parkell*, which was not decided until August 2016. Although *Parkell* is sufficiently analogous to the present case to clearly establish the right in question, prior to the issuance of *Parkell*, the right in question had not been so clearly established that any reasonable person in the warden's position would have been clearly

21

on notice. The warden is thus entitled to qualified immunity as to the claims which predate *Parkell*, specifically those claims raised by Defendants Ottinger and Provost, both of which arise out of searches conducted in 2015. The searches of Price and Strauss, however, post-date *Parkell* and arise from a point where the rights in question were clearly established. The warden is, therefore, not entitled to qualified immunity as to their claims.

### G.    Defendants' arguments as to Plaintiff Strauss's failings

Defendants argue that Strauss's claims should be dismissed with prejudice because he failed to appear for an independent medical examination with Defendants' expert on multiple occasions and failed to complete his deposition. The Court recognizes that Strauss's behavior has, in some ways, hindered Defendants' ability to defend their claims in this matter and may therefore warrant possible discovery related sanctions up to, and including, the striking of certain expert testimony regarding Strauss should Defendants file an appropriate motion in limine. The Court, however, does not find that Plaintiff Strauss has so failed to prosecute his case as to warrant dismissal of his claims with prejudice and, therefore, denies Defendants' request to dismiss Plaintiff Strauss's claims for failure to prosecute.

### H.    Defendants' motion to seal

Finally, Defendants have filed a motion to seal various parts of the summary judgment record in this matter. (ECF No. 191.) These documents include the medical and mental health information of Plaintiffs, as well as several documents related to confidential jail policies and bidding documents. Plaintiffs filed an opposition to the motion and insist that no document in this matter should be sealed. (ECF No. 193.) Plaintiffs' counsel, however, previously filed similar policy documents under seal, seemingly recognizing their confidential nature and the State's interest in not unnecessarily exposing those documents to general public view. Having considered Defendants' motion and finding that the policy and health documents present significant privacy

interests on behalf of the parties, and considering Plaintiffs' own actions reflecting that those policy documents should be filed under seal, the Court grants Defendants' motion to seal.

## IV.  CONCLUSION

Defendants' motions for summary judgment (ECF Nos. 172, 175, 178, and 181) are **GRANTED IN PART** and **DENIED IN PART**, Plaintiffs' motion for summary judgment (ECF No. 184) is **DENIED**, and Defendants' motion to seal (ECF No. 191) is **GRANTED**.  An appropriate order follows.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

Dated: May 28, 2026